UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **29 GREENWOOD, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )   **Civil Action No.** |
| v. | )   **23-10800-FDS** |
| | ) |
| **MAYOR RUTHANNE FULLER, DOUG** | ) |
| **CORNELIUS, PETER DIMOND, KATY** | ) |
| **HAX HOLMES, JOHN LOJEK, ANTHONY** | ) |
| **CICCARIELLO, NEWTON HISTORICAL** | ) |
| **COMMISSION, and CITY OF NEWTON,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

SAYLOR, C.J.

This case concerns an alleged government taking of a property in Newton,

Massachusetts.  The property, located at 29 Greenwood Street, included a historic house that had

been built in 1744 and designated a Newton Local Landmark in 2005.

In January 2021, plaintiff 29 Greenwood, LLC obtained title to the property in order to

renovate it.  The property was subject to various restrictions, imposed as part of a certificate of

appropriateness issued to the prior owner, that were intended to preserve its historic character.

Rather than preserve and restore the property, in April 2021 plaintiff demolished the

house.  The present dispute concerns the plans proposed by plaintiff to remedy its violation of

the historic restrictions, which thus far the City has not accepted.  According to plaintiff, by

failing to approve its plans, the City unlawfully deprived it of the use of its property in violation

of the Fifth Amendment and other federal and state law.

Plaintiff has filed suit against the City of Newton, the Newton Historical Commission, Ruthanne Fuller (Mayor of the City of Newton), Doug Cornelius (Chair of the Newton Historical Commission), Peter Diamond (former Chair of the Newton Historical Commission), Katy Hax Holmes (former Chief of Planning for the City of Newton), John Lojek (Commissioner of the Inspectional Services Department), and Anthony Ciccariello (Deputy Commissioner/Plans Examiner of the Inspectional Services Department).  The complaint asserts four counts:  (1) violation of the Takings Clause of the Fifth Amendment against the municipal defendants; (2) violation of Article 10 of the Massachusetts Civil Rights Act against the individual defendants in their individual capacities; (3) tortious interference with prospective advantage against the individual defendants in their individual capacities; and (4) violation of the Excessive Fines Clause of the Eighth Amendment against the municipal defendants.

Defendants have moved to dismiss the complaint in its entirety for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the motion will be granted.

## I.   Background

### A.   Factual Background

The facts are set forth as alleged in the First Amended Complaint ("FAC") unless indicated otherwise.

The structure formerly located at 29 Greenwood Street in Newton, also known as the Gershom Hyde House, was built in approximately 1744.  (FAC ¶ 29).  Although it underwent "a considerable number of renovations" in the centuries following its construction, the house was listed on the National Register of Historic Places in 1986 and designated a Newton Local Landmark in 2005.  (*Id.* at ¶ 30).

According to the complaint, by 2011, the property was "uninhabited and in substantial decay." (*Id.* at ¶ 33). According to one 2013 report, the property was "suffering from rot, fire damage, moisture, sinking, decay and numerous other structural problems that rendered the house and barn uninhabitable and unsalvageable." (*Id.*).

In 2017, plaintiff's predecessor-in-interest submitted applications to the Newton Historical Commission ("NHC") and Inspectional Services Department ("ISD") to undertake construction on the property. (*Id.* at ¶ 38). On July 27, 2017, "the NHC unanimously approved the issuance of a certificate of appropriateness, based on the then-owner's architectural plans submitted to and approved by the Commission." (*Id.*). The certificate of appropriateness "approved a demolition of the rear portion of the house and a significant addition onto the rear of the Property." (*Id.* at ¶ 39). It "further called for a complete renovation and reconstruction of the original residence." (*Id.*). That certificate of appropriateness was later extended on February 28, 2019, and again on February 27, 2020. (*Id.* at ¶ 41).

In January 2021, plaintiff 29 Greenwood, LLC acquired the property for $1,150,000. (*Id.* at ¶¶ 44-45). At that time, plaintiff "ensured that all its permits were valid and, at the direction of the ISD, transferred the demolition and construction permits to its own contractors." (*Id.* at ¶ 46).

In February 2021, plaintiff began construction activities on the property. (*Id.* at ¶ 47). ISD remained involved, "monitoring the progress with the Project, including meeting with Plaintiff's on-site general contractor and site personnel." (*Id.*).

On February 11, 2021, ISD issued a stop-work order after plaintiff removed a gable end of the house. (*Id.* at ¶ 48). On February 13, 2021, plaintiff provided ISD and Katy Hax Holmes, the Chief of Planning, with a letter from a structural engineer who had been retained by plaintiff

"to assess the structural integrity of the house and render a professional opinion." (*Id.* at ¶¶ 49-50). Plaintiff's engineer concluded that the structure was "highly compromised due to long term neglect and moisture infiltration that in t[urn] has attracted termite infiltration." (*Id.* at ¶ 50). As a result, the letter stated, "renovations of the existing building [would be] virtually impossible without replacing every single structural member of the building in order to meet certain building code and structural criteria." (*Id.*). Plaintiff later provided the city with a supplemental report "detailing the extensive structural damage and rot on the Property." (*Id.* at ¶ 56).

After numerous e-mail communications and onsite meetings involving plaintiff, ISD, the NHC, and various city officials, plaintiff "put the gable back in . . . . in one piece," and the first stop-work order was lifted. (*Id.* at ¶¶ 51-58). Plaintiff then resumed work on the property. According to the complaint, plaintiff took "painstaking, costly and time-consuming efforts to preserve the portions of the main house that could be salvaged for integration into reconstruction." (*Id.* at ¶ 60). ISD inspector Paul Gilbert allegedly visited the site daily to monitor the work. (*Id.* at ¶ 61).

At some point in April 2021, plaintiff demolished the historic portion of the house. Plaintiff does not dispute that it did so.

The complaint alleges that despite a history of cooperation between plaintiff and Newton officials, at that point defendants "decided to take a far different and far more confrontational position against Plaintiff." (*Id.* at ¶ 63). More specifically, they allegedly decided that "under no circumstances would this Project be allowed to go forward, and under no circumstance would the Plaintiff be allowed by the City to develop the Project and sell it, for a profit or otherwise." (*Id.* at ¶ 65).[1]

---

[1] The complaint alleges that on March 15, 2021, "Hax Holmes emailed Plaintiff inquiring as to whether the Property was being listed for re-sale." (*Id.* at ¶ 64). At the same time, she "telephoned Plaintiff's real estate broker

According to the complaint, on April 29, 2021, e-mail correspondence among city officials accused plaintiff of "unilaterally taking the house down, claiming it was 'torn down' despite the 'best efforts' of inspector Gilbert and Hax Holmes." (*Id.* at ¶ 66). A second stop-work order was issued by ISD on April 30, 2021. (*Id.* at ¶ 68).

According to the complaint, in May 2021, "online news articles were being posted to the City's website expressing the public's misinformed outrage and calling for the maximum penalties and fines against Plaintiff." (*Id.* at ¶ 75). It alleges that "an internal 'blame game' erupted amongst ISD, the NHC and other City departments, triggered by complaints from citizens, many of which were surreptitiously stirred up by Hax Holmes and other Defendants and City officials." (*Id.* at ¶ 77). Although the ISD had allegedly begun to "acknowledge that the plans approved for the Project were at least ambiguous enough to permit the work undertaken by the Plaintiff," Hax Holmes was "compartmentalizing information within the City's departments in order to paint Plaintiff in the worst possible light and drive the NHC towards imposing draconian penalties against Plaintiff, with the added benefit of deflecting 'blame' from the NHC and onto the Plaintiff." (*Id.* at ¶¶ 81-82).

On May 27, 2021, the NHC conducted a public meeting. According to the complaint, it "incorrectly and unlawfully determined" that plaintiff's demolition of the historic house violated the Landmark Ordinance. (*Id.* at ¶ 83). Plaintiff did not, however, appeal that determination. The commission also voted to impose a fine against plaintiff of $300 per day. (*Id.* at ¶ 84).[2]

---

under a pretext, pretending to be an interested buyer." (*Id.*). During the phone call, Hax Holmes "blew up at the broker and started yelling, only then revealing her true identity." (*Id.*). The complaint concludes that "by this time, Hax Holmes, in conjunction with the other Defendants were working, through a deliberate stratagem, to affirmatively impede Plaintiff's efforts with respect to the Property." (*Id.*).

[2] According to the complaint, as of October 17, 2023, plaintiff had accrued approximately $270,000 in fines. (*Id.* ¶ 84).

On May 29, 2021, city officials allegedly acknowledged in internal e-mails that "[r]ight now the developer is stuck with a property that he can't do anything with and its costing him $300 per day."  (*Id.* at ¶ 86).  They also allegedly acknowledged that they "intend[ed] to make it hard" for plaintiff to profit from the project, and noted:  "We don't have to do anything at this point.  Time is on our side."  (*Id.* at ¶ 88).

On July 7, 2021, "citizens of Newton began signing a petition calling for the Commission to deny any and all plans submitted regarding the Property."  (*Id.* at ¶ 92).

As noted, after the NHC issued a determination that plaintiff had violated the Landmark Ordinance, plaintiff did not appeal.  Instead, it submitted a proposal to reconstruct the building to remediate the violation.  (*Id.* at ¶ 93).

On August 11, 2021, plaintiff "submitted an extensive proposal to repair and restore the Property's damaged 18th century post and beam structure and to construct a historically accurate exterior over the restored structure."  (*Id.* at ¶ 93-96).

On August 26, 2021, the NHC held a public hearing to review plaintiff's proposal.  (*Id.* at ¶ 101).  At the hearing, plaintiff's architect "presented the Board with extensive information in support [of] Plaintiff's proposal to remediate the alleged violation of the COA and resume work on the Project."  (*Id.*).  The architect stated that "the aim of Plaintiff's proposal was to construct a historically accurate exterior to the Property and incorporate and repair existing elements of the property which had not been discarded as part of the planned and approved rehabilitation of the Property."  (*Id.* at ¶ 102).  Furthermore, the architect affirmed that "any original elements of the Property that could not be reused would be measured and replicated."  (*Id.* at ¶ 103).

After the August 26 hearing, plaintiff was "asked to provide another complete set of design plans for its proposed repair and rehabilitation of the Property, including for the

previously approved rear addition." (*Id.* at ¶ 106).  On October 6, 2021, plaintiff "submitted a full set of architectural drawings illustrating the rehabilitation work to be completed at the Property" and submitted complete building exterior drawings, a materials specification booklet, color renderings of the project exterior and a narrative summary of Plaintiff's plans." (*Id.* at ¶ 107).  On October 21, 2021, in response to further inquiry by the NHC, plaintiff "provided additional information concerning the elevation and height of various aspects of the project." (*Id.* at ¶ 109).

According to the complaint, even though plaintiff "by this time was endeavoring in good faith to resolve the controversy positively and proactively in good faith," defendants had "already decided that they would not accept any resolution by Plaintiff but would instead punish Plaintiff." (*Id.* at ¶ 113).  The complaint further alleges that Mayor Fuller had become involved in the scheme and had "taken a stance of punishing Plaintiff." (*Id.* at ¶ 110).  Plaintiff was "denied any chance to remediate and improve the Property," and the project was "absolutely and indefinitely paralyzed." (*Id.* at ¶ 115).  There was "no possible way" for plaintiff to "comply with any type of City standard." (*Id.*).

On October 28, 2021, the NHC held another public meeting concerning the property.  At the meeting, the commission allegedly "revoked its prior approval of the rear addition to the Property claiming that Plaintiff's partial demolition of the property, which complied with its building permit, somehow nullified the Board's prior approval of the rear extension." (*Id.* at ¶ 121).

According to the complaint, by January 2022, plaintiff had become increasingly "astonished at the City's 'move the goalposts' strategy of delaying any action to resolve the NHC's issues with the Project, a plan which the NHC knew was costing Plaintiff $300 per day in

fines and causing a complete shutdown of the Project." (*Id.* at ¶ 124).  On January 14, 2022, in an e-mail to the Chief Preservation Planner, plaintiff's architect wrote:  "I am genuinely concerned that due to the high level of emotion surrounding the Gershom Hyde house there may have been a failure to communicate or a misunderstanding that is blocking the path for us to move the reconstruction process forward." (*Id.* at ¶ 125).

On April 20, 2022, the NHC contacted plaintiff and requested that "it justify its research process with respect to its submitted rehabilitation plans for the Property, as-built documentation and proposed construction." (*Id.* at ¶ 127).  Although the complaint alleges that that information had already been submitted to the commission, plaintiff provided all of the requested information on April 22, 2022.  (*Id.* at ¶ 129).

On April 28, 2022, the NHC held a meeting "during which the Plaintiff, in an effort to assuage the concerns of the Commission, submitted revised plans to address the alleged violations of the certificate of appropriateness, thereby eliminating the proposed, and previously approved, rear addition, restoring the original footprint of the Property and reincorporating preservation ideals and the historic fabric of the Property that was not even present at the Property prior to the approved partial demolition." (*Id.* at ¶ 130).  According to the complaint, plaintiff did so even though those proposed plans would be "extraordinarily expensive and would eliminate any potential profit that may have been obtained by the Plaintiff under the plans for the Property that the Commission had already approved at the time Plaintiff took title thereto in January 2021." (*Id.* at ¶ 131).  At the conclusion of the April 28 meeting, the NHC requested additional information.[3]

_____

[3] According to the complaint, it was not clear to the NHC itself what information plaintiff still needed to provide. (*Id.* at ¶ 134).  City officials were allegedly "unsure of how to proceed." (*Id.*).  One official allegedly suggested that plaintiff "[s]how a detailed budget sheet that shows no profit." (*Id.* at ¶ 135).

On May 27, 2022, plaintiff "submitted yet another set of updated plans and specifications to the Commission for a new building on the Property."  On June 23, 2022, it submitted "a list of the resources used and the archives which were reviewed to develop its plans and determine the period of significance for the structure."  (*Id.* at ¶ 138).

On August 2, 2022, the NHC, after a public hearing, "rejected the Plaintiff's revised plans, claiming that its submissions did not meet the Secretary of the Interior's Standards for the Reconstruction of Historic Properties," which (according to the complaint) "the City had never adopted."  (*Id.* at ¶ 139).  Finally, "[o]n August 12, 2022—more than fifteen months after issuing the total Stop Work Order on April 30, 2021, and after numerous submissions and re-submissions—the NHC again rejected Plaintiff's remediation plan."  (*Id.* at ¶ 140).

Upon issuing that rejection, the City allegedly "barred Plaintiff from accessing the Property and from removing anything therefrom—including the historic materials Plaintiff intended to preserve for reintegration in the reconstructed house."  (*Id.* at ¶ 185).  The City also allegedly barred plaintiff "from performing work of any kind, including repairs, winterizing and other routine maintenance, on the Property site."  (*Id.* at ¶ 186).

At the same time, after plaintiff on March 31, 2023, filed its initial complaint in this action, "the City of Newton filed a criminal complaint against Plaintiff in connection with the $300 daily fine imposed by the Commission.  Defendant John Lojek signed an affidavit in support of the complaint, stating that Plaintiff demolished a building on landmark property without a proper certificate of appropriateness, and thus, Plaintiff owed, at that moment, $210,000 for an alleged violation [of] Newton's Landmark Ordinance."  (*Id.* at ¶ 187).  The complaint alleges that the "criminal complaint is just the latest in a long line of coercive, retaliatory, and intimidating tactics by the City."  (*Id.* at ¶ 197).

On October 13, 2023, the City informed plaintiff of "conditions on the Property that violate the Newton Revised Ordinances, Chapter 5, Article II, Section 5-22(b), which concerns accumulation of 'junk' or debris and overgrowth of vegetation." (*Id.* at ¶ 199).  According to the complaint, however, at the same time "Plaintiff's prior efforts to enter the Property to remove construction debris or otherwise perform such maintenance have been met with remonstrance, and the Plaintiff was specifically instructed to seal off the Property by the Defendants." (*Id.* at ¶ 200).

The complaint alleges that plaintiff will "now face additional fines for failing to remedy conditions on a Property on which Defendants have categorically prevented Plaintiff from entering onto and working on for the past two-and-a-half years." (*Id.* at ¶ 201).  And it alleges that it is unable to "remedy the present conditions on the Property nor to complete the Project as contemplated despite the fact that Plaintiff at all times acted within the scope of the approved plans and the COA." (*Id.* at ¶ 212).

### B.    Procedural Background

The original complaint was filed on February 16, 2023, in Middlesex Superior Court.  On April 13, 2023, defendants removed the action to this Court.  Defendants moved to dismiss the complaint for failure to state a claim on April 24, 2023; in response, plaintiff moved for leave to file an amended complaint.  The Court granted plaintiff's motion on October 3, 2023, and the amended complaint was filed on October 17, 2023.

As noted, the amended complaint asserts claims against the City of Newton, the Newton Historical Commission, Ruthanne Fuller, Doug Cornelius, Peter Diamond, Katy Hax Holmes, John Lojek, and Anthony Ciccariello.  The amended complaint asserts four counts:  (1) violation of the Takings Clause of the Fifth Amendment and violation of Mass. Gen. Laws ch. 79, § 10 against the municipal defendants; (2) violation of Article 10 of the Massachusetts Civil Rights

Act against the individual defendants in their individual capacities; (3) tortious interference with prospective advantage against the individual defendants in their individual capacities; and (4) violation of the Excessive Fines Clause of the Eighth Amendment against the municipal defendants.

Defendants have moved to dismiss the amended complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.   <u>Standard of Review</u>

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

**III.**    <u>**Analysis**</u>

    **A.**    <u>**Claim for Violation of the Fifth Amendment and Mass. Gen. Laws ch. 79, §**</u>
<u>**10 (Count 1)**</u>

Count 1 alleges that the City of Newton and the NHC violated the Fifth Amendment to
the United States Constitution as well as Mass. Gen. Laws ch. 79, § 10.  It alleges that
defendants "hatched a plan to revoke Plaintiff's authority to continue to work on the Project and
make it economically and physically impossible to finish the Project, thereby taking the Property
for the City."  (FAC ¶ 220).  It alleges that "[d]efendants did not merely produce some
fluctuation of the property's value, but in fact deprived Plaintiff of any sort of economic value
that could be obtained from the Property."  (*Id.*).  As a result, it alleges that defendants "made a
*regulatory taking*" of the property.  (*Id.* at ¶ 220) (emphasis added).

The Fifth Amendment provides that "private property [shall not] be taken for public use,
without just compensation." U.S. CONST. amend. V.  Similarly, Mass. Gen. Laws ch. 79, § 10
provides that "[w]hen the real estate of any person has been taken for the public use or has been
damaged by the construction, maintenance, operation, alteration, repair or discontinuance of a
public improvement or has been entered for a public purpose, but such taking, entry or damage
was not effected by or in accordance with a formal vote or order of the board of officers of a
body politic or corporate duly authorized by law . . . and by such taking, damage, entry, seizure,
destruction or use he has suffered an injury for which he is entitled to compensation, the
damages therefor may be recovered under this chapter."  Mass. Gen. Laws ch. 79, § 10.

The Supreme Court has held that there are "two categories of regulatory action that
generally will be deemed *per se* takings for Fifth Amendment purposes."  *Lingle v. Chevron
U.S.A. Inc.*, 544 U.S. 528, 538 (2005).  First, the government must provide just compensation if
it "requires an owner to suffer a permanent physical invasion of her property—however minor."

*Id.*  Second, the government must provide just compensation where it "completely deprive an owner of 'all economically beneficial us[e]' of her property . . . . except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Id.* (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 1030 (1992)).

Outside of those two "*per se*" categories, "regulatory takings challenges are governed by the standards set forth in *Penn Central.*" *Id.*  In *Penn Central*, the Supreme Court " identified several factors that have particular significance" for evaluating a regulatory-taking claim.  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Those factors include the "economic impact of the regulation on the claimant," "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action." *Id.*

Here, plaintiff's regulatory-takings claims are subject to dismissal under the *Penn Central* framework.[4]  To begin, plaintiff's arguments largely ignore the basic (and undisputed) fact that it purchased the property knowing that it was subject to the Landmark Ordinance, and that the certificate of appropriateness issued to its predecessor contained various restrictions and requirements intended to preserve the historic structure.  It is a reasonable inference that the price paid by plaintiff for the property reflected those restrictions.  And plaintiff does not dispute that

---

[4] Defendants contend that "Plaintiff waived its right to argue against the application of the stop work order, and the determination by the NHC that it violated the certificate of appropriateness, when it failed to appeal these determinations in the time period set forth by state statute and local ordinance."  (ECF No. 33, 6).  Pursuant to the Ordinances of the City of Newton, "[a]ny person aggrieved by a determination of the commission, or by the finding of a person or persons making an administrative review as provided herein, may, within twenty . . . days after the filing of the notice of the aforesaid determination or finding with the city clerk, appeal to the superior court sitting in equity for Middlesex County."  NEWTON, MASS., REV. GEN. ORDINANCES, ch. 22, § 22-71.  Again, plaintiff does not dispute that it did not appeal the NHC's decision.  Even putting aside the issue of whether that failure to appeal is fatal to its claim under Count 1, the complaint still fails to allege sufficient facts to state a claim for a regulatory taking.

the City determined that it violated the ordinance when it demolished the structure—again, a determination that plaintiff did not appeal.  This dispute arises out of the remedial measures that plaintiff has proposed and the City has thus far failed to approve.  Particularly when viewed in that light, the claim of a regulatory taking is plainly deficient.

As to the first *Penn Central* factor, the "economic impact of the regulation on the claimant," the complaint alleges in conclusory terms that defendants have "deprived it of *all* use—economic or otherwise—of the Property in the name of 'preservation.'"  (FAC ¶ 3).  It also alleges that defendants have "opportunistically leveraged the misinformed disapproval of the public to bar Plaintiff from ever developing the Property or realizing a profit of any kind."  (*Id.* at ¶ 207).  According to the complaint, "qualified buyers interested in purchasing" the property have all "ultimately walked away" due the defendants' "pattern of malice and corruption impeding completion of the Project and otherwise tainting the Property."  (*Id.* at ¶¶ 209-10).

The  complaint does not allege, however, a plausible factual basis for the claim that plaintiff has lost all of its possessory rights.  It does not allege, for example, that plaintiff no longer holds title to the property, that it has lost its right to sell the property, or that it has lost its right to use the property consistent with the Landmark Ordinance.  As the First Circuit has held, government "infringement that leaves virtually the whole of the owner's possessory rights intact does not constitute a taking."  *McAndrews v. Fleet Bank of Massachusetts, N.A.*, 989 F.2d 13 (1st Cir. 1993).

At most, the complaint alleges a temporary diminution in property value until the City approves a new set of construction plans—that is, a remedy for plaintiff's undisputed destruction of a protected historic structure.  *See Ruiz*, 496 F.3d at 5.  While the complaint alleges that defendants' actions have been "characterized by constantly changing rules and standards," it

does not allege that it has been precluded from submitting new development plans that do comply with those requirements and standards.  (FAC ¶ 220).  And while the complaint contains a great deal of charged rhetoric and conclusory allegations, it does not assert a plausible factual basis to believe the City would never approve plans that in fact comply with historic renovation standards.  (ECF No. 33, 8).  Courts have held uniformly that such a diminution of property value does not constitute a taking.  *See, e.g.*, *Agins v. City of Tiburon*, 447 U.S. at 263, n. 9 (1980) (highlighting that "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership" and "cannot be considered as a taking in the constitutional sense") (internal quotation marks omitted); *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 645 (1993) (explaining that "diminution in a property's value, however serious, is insufficient to demonstrate a taking"); *Penn Cent.*, 438 U.S. at 131 (noting that courts "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking'").

As to the second *Penn Central* factor, "the extent to which the regulation has interfered with distinct investment-backed expectations," the complaint also falls short.  *Penn Cent.*, 438 U.S. at 124.  It alleges that "when Plaintiff purchased the Property, it possessed approved plans to develop the Property."  (FAC ¶ 217).  In addition, "[a]s Plaintiff undertook to partially demolish and reconstruct the Property in accordance with the approved plans and COA, Defendant was fully aware of the structural condition of the property," which was "structurally unsound, uninhabited and susceptible to collapse."  (FAC ¶¶ 217-19).  Based on that, plaintiff contends that "[p]recisely due to the existence of approved plans and COA, Plaintiff had an investment-backed expectation, since its Project was in full compliance with the City ordinances."  (*Id.* at ¶ 219).

The adoption of the Landmark Ordinance and the subsequent designation of the structure as historic—both of which preceded plaintiff's purchase of the property—clearly did not interfere with plaintiff's reasonable investment-backed expectations.  Plaintiff does not allege that it "invested in land for development, only to see a novel regulation destroy the value of [its] property."  (ECF No. 33, 10).  Instead, it knew when it purchased the property in 2021 that the structure was a designated historical landmark and that all construction required approval by the City.  (FAC ¶¶ 44-47).  And it reasonably should have expected that the City would enforce its restrictions if plaintiff violated them.  Plaintiff therefore had no "reasonable, investment-backed expectation that it would be allowed to demolish the landmarked home on the Property."  (ECF No. 33, 9).  As the court explained in *Grasso v. City of New Bedford*, "[t]he government is not required to compensate an individual for denying him the right to use that which he has never owned."  *Grasso v. City of New Bedford*, 55 Mass. App. Ct. 1116, at *11 (2002) (internal quotation marks omitted).

Finally, the claim fails under the third *Penn Central* factor, "the character of the governmental action."  *Penn Cent.*, 438 U.S. at 124.  The allegations of the complaint concern the city's enforcement of the Landmark Ordinance and its denial of plaintiff's remediation applications.  Such actions are "typically given great leeway by courts."  *Zarba v. Town of Oak Bluffs*, 2020 WL 4597012, at *4 (D. Mass. Aug. 11, 2020), *aff'd*, 2021 WL 4025643 (1st Cir. Aug. 13, 2021); *see also Sutton v. Chanceford Twp.*, 186 F. Supp. 3d 342 (M.D. Pa. 2016) (noting that "if the law at issue applies generally to a broad class of properties, a court is likely to find that no taking has occurred" and that "[s]tate and local laws affecting land use, including zoning laws, are extended broad latitude under current standards") (internal quotation marks omitted).

16

In short, the allegations of the complaint show that plaintiff purchased the property knowing that it was subject to historic restrictions; demolished the property in violation of those restrictions; and to date has failed to propose a remedial plan that met with the City's approval. That is insufficient, under the circumstances, to state a claim for a regulatory taking in violation of the Fifth Amendment.  Accordingly, the motion to dismiss will be granted as to Count 1.

**B.**      **Claims for Violation of Massachusetts Civil Rights Act (Count 2) and Tortious Interference with Prospective Advantage (Count 3)**

Count 2 asserts a claim against the individual defendants (Fuller, Cornelius, Dimond, Hax Holmes, Ciccariello, and Lojek) in their individual capacities under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §§ 11H-11J.  Count 3 asserts a claim against the individual defendants in their individual capacities for tortious interference with prospective advantage.  Defendants contend that both Counts 2 and 3 should be dismissed against defendants Fuller, Lojek, Ciccariello, Hax Holmes, and Cornelius for insufficient service of process.

**1.**      **Insufficient Service of Process**

Before a federal court may exercise personal jurisdiction over a defendant, proper service of process must be effected.  *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).  When the sufficiency of process is challenged under Rule 12(b)(5), plaintiff bears "the burden of proving proper service." *Rivera-Lopez v. Municipality of Dorado*, 979 F.2d 885, 887 (1st Cir. 1992).  Rule 4 sets forth the acceptable methods for service of process.  Fed. R. Civ. P. 4.

Under Rule 4(e), there are four ways to serve an individual defendant within a federal judicial district:  (1) by following the requirements of state law for serving a summons in actions brought in the courts of general jurisdiction in the state where the district court is located or where service is made; (2) by delivering a copy of the summons and the complaint to the

individual personally; (3) by leaving copies of those items at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or (4) by delivering copies to an agent authorized by appointment or by law to receive service of process.

Under the federal rules, service of process must take place within 90 days after the complaint is filed, or the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). If the plaintiff shows good cause, then "the court must extend the time for service for an appropriate period." *Id.* The court, in its discretion, may also grant an extension of time even absent good cause. Fed. R. Civ. P. 4 Advisory Committee's Note (1993).

Defendants contend that Fuller, Lojek, Ciccariello, Cornelius, and Hax Holmes have never been served with a copy of the original complaint.[5] With respect to Fuller, Lojek, Ciccariello, and Cornelius, it does not appear that plaintiff complied with any of the available methods under Rule 4(e). According to the proofs of service filed with the Court, they were "served with the original Complaint through a summons left with 'Janett Ferguson,' an employee in the Newton City Clerk's office." (ECF No. 33, 24).

Service was only proper, then, if Ferguson was an agent authorized by appointment or law to receive service of process on behalf of the individual defendants. There was no evidence that such is the case. Plaintiff does not identify any conduct on the part of any of the individual defendants that would lead a reasonable person to believe that they had granted Ferguson, or any other employee, apparent or actual authority to receive process for them.

---

[5] Defendants acknowledge that they were served with the amended complaint in this case. Nevertheless, that is not sufficient to cure prior deficiencies in service. *See Cryer v. UMass Medical Correctional Health*, 2011 WL 841248, at *1–2 (D. Mass. 2011) (holding that "where service of process of the original complaint has not been effected properly [plaintiffs] may not use Rule 5 to effect service of process of an amended complaint as a means to circumvent Rule 4's requirements concerning service" and noting that "[t]o hold otherwise would eviscerate the detailed requirements under Rule 4 for noticing defendants of claims against them"); *see also Morrissey v. Massachusetts*, 2022 WL 1463051, at *5 (D. Mass. 2022) (holding same).

With respect to Hax Holmes, it also does not appear that plaintiff complied with any of the available methods under Rule 4(e). Defendants state that she was "improperly served at 152 Plympton Street, Waltham, Massachusetts, an address where she has not lived since March 2020." (ECF No. 33, 24). Since then, she has been a resident of New Hampshire who "has a New Hampshire driver's license, has voted in New Hampshire and filed taxes as a New Hampshire resident." (*Id.*). Plaintiff has not contested that she did not reside at the Waltham address at the time she was purportedly served.

Indeed, plaintiff does not contest that service on the five individuals did not comply with Rule 4. Instead, it claims that the "unproven defects were [not] prejudicial," as defendants have been "actively involved in this case, fully defending their position and arguing against Plaintiff's pleadings and motions." (ECF No. 37, 23-34). Defendants, however, have not "waive[d] [their] right to move for dismissal based on improper service by filing a motion to dismiss," the first responsive pleading that they filed with the court. *Thomas v. Brasher-Cunningham*, 2020 WL 4284564, at *13 (D. Conn. July 27, 2020); *cf. Farm Credit Bank of Baltimore v. Ferrera–Goitia*, 316 F.3d 62, 68 (1st Cir. 2003) (citing Fed. R. Civ. P. 12(h)(1)) (noting that it is black-letter law that "a defense based on personal jurisdiction will be deemed waived if *not* made by a party's first-filed motion or included in her initial responsive pleading") (emphasis added). Because plaintiff failed to serve defendants within the required 90-day period, it must show good cause for failing to complete service within the deadline in order to avoid dismissal.

When a plaintiff has failed to serve process, "the burden of demonstrating the requisite good cause rest[s] upon [him]." *United States v. Ayer*, 857 F.2d 881, 884–85 (1st Cir.1988).

> [G]ood cause is likely (but not always) to be found when the plaintiff's failure to complete service in timely fashion is a result of a third person['s actions], typically the process server, the defendant has evaded service of the process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect

19

service or there are understandable mitigating circumstance, or the plaintiff is
proceeding pro se or in forma pauperis. Pro se status or any of the other listed
explanations for a failure to make timely service, however, is not automatically
enough to constitute good cause for purposes of Rule 4(m).

*McIsaac v. Ford*, 193 F.Supp.2d 382, 383 (D. Mass. 2002) (quoting Alan Wright & Arthur

Miller, Federal Practice and Procedure § 1137 (3d ed. 2002)); *see Martello v. United* States, 133

F.Supp.3d 338, 345 (D. Mass. 2015) (concluding that plaintiff failed to establish good cause

because he was not proceeding pro se and did not show diligence in attempting to effect service;

however, exercising discretion to grant extension because case would effectively be dismissed

with prejudice due to running of statute of limitations).

Plaintiff has not demonstrated good cause for the failure to effect service here.  There are

no allegations, for example, that the failure was caused by a third person or that defendants

evaded service.  Moreover, plaintiff has not acted diligently in trying to effect service.  To the

contrary, "the City put the Plaintiff on notice of insufficient service in its original Motion to

Dismiss, which was filed on April 24, 2023, more than six months ago," but plaintiff still took no

action.  (ECF No. 33, 25).  And plaintiff is not proceeding *pro se*.  Therefore, the complaint

against these defendants is subject to dismissal for insufficient service of process.

In any event, and for the following reasons, even if plaintiff had effected proper service

of process, Counts 2 and 3 would still be dismissed for failure to state a claim upon which relief

can be granted.

### 2. Claim for Violation of Massachusetts Civil Rights Act (Count 2)

Under Count 2, plaintiff alleges that the individual defendants "since April 30, 2021, and

continuing thereafter throughout 2022 . . . have interfered with Plaintiff's exercise of its property

rights, secured by the U.S. Constitution and Massachusetts Declaration of Rights."  (FAC ¶ 228).

Plaintiff further contends that "Defendants' interference with Plaintiff's property rights has

occurred with threats, intimidation, and coercion," particularly through the "filing of a retaliatory criminal complaint." (*Id.* at ¶ 230). Finally, plaintiff alleges that the defendants "knew or should have known that their conduct was unlawful and/or would violate the Plaintiff's [constitutional] rights." (*Id.* at ¶ 234).

To establish a claim under the MCRA, a plaintiff "must prove that (1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Bally v. Northeastern Univ.*, 403 Mass. 713, 717 (1989) (quoting Mass. Gen. Laws. ch. 12, § H). A threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994). Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Id.* And coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.* (quoting *Deas v. Dempsey*, 403 Mass. 468, 471 (1988)). Massachusetts courts apply an objective "reasonable person" standard to determine whether conduct constitutes threats, intimidation, or coercion. *Haufler v. Zotos*, 446 Mass. 489, 505 (2006).

The complaint asserts a claim under the MCRA against six government officials in their individual capacities: Fuller, Cornelius, Dimond, Hax Holmes, Ciccariello, and Lojek. (*See generally* FAC). Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, the court must determine (1) whether the facts

alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009).  Furthermore, "a plaintiff must plead that *each* Government-official defendant, through the official's *own individual actions*, has violated the Constitution" in order to survive a motion not dismiss.  *Iqbal*, 556 U.S. at 676 (emphasis added).

Here, the individual defendants are clearly entitled to qualified immunity.  First, the complaint does not make out a violation of a constitutional right, as the allegations are insufficient to state a claim for a regulatory taking.[6]  Second, even assuming a valid claim for violation of constitutional right, the right at issue was not clearly established at the time of the defendants' alleged misconduct.  It "cannot be said that . . . city officials would have understood that their actions" in denying a building permit would deprive plaintiffs of their property rights, given the "First Circuit's long-standing reluctance to find constitutional violations in the land-use and zoning context."  *Martone Place, LLC v. City of Springfield*, 2017 WL 5889222, at *21 (D. Mass. Nov. 29, 2017), *aff'd*,  2018 WL 11231884 (1st Cir. Dec. 19, 2018).

Accordingly, Count 2 will be dismissed as to all defendants on the basis of qualified immunity.

### 3. Claim for Tortious Interference with Prospective Advantage (Count 3)

In Count 3, the complaint alleges that the individual defendants knew that plaintiff was a "developer intending to construct and sell the Property to a future homeowner."  (FAC ¶ 237).  It

---

[6] Moreover, the complaint does not plead that *each* defendant through the official's own individual actions violated plaintiff's constitutional rights.  Defendant Ciccariello, for example, is mentioned in the complaint only once as being the recipient of an e-mail from Hax Holmes on April 29, 2021.  (FAC ¶ 66).  Similarly, defendant Fuller is simply alleged to have "corresponde[d] with citizens of Newton regarding their outrage about the Property."  (FAC ¶¶ 126).

further alleges that "Defendants hatched a strategy to interfere with the Plaintiff's prospective business advantage(s) by making it impossible for Plaintiff to obtain approvals on the Project through a 'move-the-goal-post' strategy and by otherwise stringing the Plaintiff along until such a time that Defendants would be able to take the Property for the City without any fair compensation."  (*Id*. ¶ 240).   In doing so, according to the complaint, defendants acted "intentionally, in bad faith, with malice and with corruption."  (*Id*. ¶ 246).  As a result, defendants "deprived Plaintiff of at least two . . . discrete opportunities to profitably dispose of the Property."  (*Id*. ¶ 244).

Defendants contend that the individual defendants are protected by common-law discretionary-function immunity.  Under Massachusetts common law, government employees exercising judgment and discretion as public officials and in good faith are immune from suit. *See Najas Realty, LLC v. Seekonk Water Dist.*, 821 F.3d 134, 145-46 (1st Cir. 2016) (affirming dismissal of intentional tort claims and explaining that "a public official, exercising judgment and discretion, is not liable for negligence or other error in the making of an official decision if the official acted in good faith, without malice, and without corruption") (citations omitted).

Here, the complaint does not allege that Fuller, Cornelius, Dimond, Hax Holmes, Ciccariello, or Lojek acted at any time outside of their official capacity.  Instead, the complaint "exclusively recounts actions the City Officials took in the exercise of their duties as City employees, in the performance of their typical job duties:  The Mayor communicated with the public, the Commissioner of Inspectional Services and his Deputy enforced the City's laws regarding landmarked properties, an employee of the Planning Department assisted the NHC in discharging its official duties, and the individual members of the NHC performed their standard role as voting members of a local body making discretionary land use decisions."  (ECF No. 33,

12); *see also Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 398 (1996) (noting that council members act in their official capacity when making discretionary decisions concerning permit applications).

Furthermore, the complaint does not allege plausible facts sufficient to overcome the presumption that the defendants were acting in good faith in carrying out their official duties. *See Najas Realty*, 821 F.3d at 146 (noting that "[t]here is every presumption in favor of the honesty and sufficiency of the motives actuating public officers in actions ostensibly taken for the general welfare") (quoting *S. Bos. Betterment Trust Corp. v. Bos. Redev. Auth.*, 438 Mass. 57, 69 (2002)).  Instead, it merely alleges, in conclusory terms, that the defendants at all times "acted intentionally, in bad faith, with malice and with corruption."  (FAC ¶ 246).  That is not sufficient to state a plausible claim.  The complaint therefore fails to state a claim of tortious interference against the defendants in their individual capacity.

Even if the individual defendants were not entitled to discretionary-function immunity, the claim would still fail.  To state a claim for tortious interference with a contract or business relationship, a complaint must allege "(1) the existence of a contract or business relationship which contemplated economic benefit; (2) the defendant['s] knowledge of the contract or business relationship; (3) the defendant['s] intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages."  *Swansen Dev. Corp. v. City of Taunton*, 423 Mass. 390, 338 (1996).

While the complaint identifies at least two opportunities that plaintiff had to "profitably dispose of the Property," it makes no allegation that the individual defendants knew of those potential sales.  The complaint does not plead any facts to suggest that the defendants were "aware of a specific buyer, contract, negotiation or plans for sale."  (ECF No. 33, 18).  Instead, it

merely alleges that "Defendants knew that Plaintiff was a developer intending to construct and sell the Property to a future homeowner." (FAC ¶ 237). Plaintiff cannot sustain a claim of tortious interference on that basis. It is not sufficient for plaintiff to claim that it is a developer who generally sought to develop the property for re-sale. *See Katin v. Nat'l Real Estate Info. Services, Inc.*, 2009 WL 929554, at *8 (D. Mass. March 31, 2009) (dismissing a claim for tortious interference where plaintiff alleged "general efforts to compete for prospective customers in the market at large"). And it is not sufficient for plaintiff to claim that defendants interfered with a contract or business relationship without showing that defendant had knowledge of the specific relationship. *See Fisher v. Stiglitz*, 302 F. Supp. 3d 457, 460 (2018) (dismissing a claim for tortious interference where "Plaintiff does not allege whether Defendants were aware of his customers, nor does he specify the opportunity that was lost, whether the Defendants were *aware of specific opportunity*, or that they employed improper means to interfere with that opportunity") (emphasis added).

Count 3 will therefore be dismissed as to all defendants.

### C.      Claim for Violation of the Eighth Amendment (Count 4)

Count 4 alleges that the City of Newton and the Newton Historical Commission violated the Excessive Fines Clause of the Eighth Amendment to the United States Constitution by "impos[ing] daily fees against Plaintiff that approximate or exceed . . . $270,000 . . . to date." (FAC ¶ 250). In particular, plaintiff contends that because its "conduct giving rise to the purported violation did not cause harm or otherwise threaten the public good," the fine at issue is "grossly disproportionate to any impact caused by the Plaintiff's conduct." (*Id.* at ¶ 253-54). Moreover, the fine "is designed to punish Plaintiff and serves no legitimate public interest." (*Id.* at ¶ 255). Defendants contend that plaintiff's claim "should be dismissed as unripe" because "a specific penalty has not been assessed against the Plaintiff with any finality." (ECF No. 33, 21-

22).

The ripeness doctrine is intended to "prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). To be ripe, a complaint must "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of the judicial relief sought." *Reddy*, 845 F.3d at 500 (quotation marks and citations omitted).

Courts have held that "challenges under the Excessive Fines Clause are . . . generally not ripe until the actual, or impending, imposition of the challenged fine." *United States v. Emerson*, 107 F.3d 77, 80 n. 5 (1st Cir. 1997) (quoting *Cheffer v. Reno*, 55 F.3d 1517, 1523 (11th Cir. 1995)); *see also United States v. Paul Revere Transp., LLC*, 608 F. Supp. 2d 175 (D. Mass. 2009) (denying a pre-enforcement challenge under the Eighth Amendment Excessive Fines Clause as unripe). Until that time, plaintiff's allegations "amount to mere speculation about contingent future events." *Reno*, 55 F.3d at 1524.

Here, it is true that the complaint alleges that the NHC "voted in favor of imposing a daily fine of $300 against Plaintiff beginning on April 30, 2021." (FAC ¶ 84). The city, however, also initiated a criminal complaint against plaintiff to recover those fines. (*Id.* at ¶ 257). As defendants note, "that matter is still pending, and the parties do not yet have a trial date." (ECF No. 33, 22). At trial, the City of Newton would "have to prove to the [Newton] District Court that it is entitled to collect the accrued fines before Plaintiff is ordered to pay any sum." (*Id.*). Until that time, there has been no "determin[ation] whether the City can collect the fines, and in what amount." (*Id.*). Indeed, on March 1, 2024, defendants at the hearing on their

motion to dismiss acknowledged:  "The [Newton District] Court will make the final

determination regarding what fines are and are not due and issue an order requiring payment or,

frankly, nonpayment, saying that there is no fine due here.  And that's completely within the

Court's discretion.  As I've stated, obviously the City is advancing its legal position that fines are

due, but that's not equivalent to a final order to pay a fine."  (Mot. Hr'g Tr. March 1, 2024).

 As a result, this Court "cannot determine . . . what penalties will actually be imposed."

*Reno*, 55 F.3d at 1524.  Instead, "[it] can only speculate as to . . . [what] will come to pass." *Id.*

Accordingly, any Eighth Amendment "inquiry is better postponed until the issues are presented

in . . . more concrete circumstances." *Id.*  Defendants' motion to dismiss as to plaintiff's Eighth

Amendment claim will therefore be granted for lack of ripeness.

## IV.    **Conclusion**

 For the foregoing reasons, defendants' motion to dismiss the amended complaint is

GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  April 30, 2024